IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On Brief April 19, 2005

STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v.
AMANDA  HARDIN, ET AL.

A Direct Appeal from the Juvenile Court for Benton County
No. 3412     The Honorable Clyde Watson, Judge

No. W2004-02880-COA-R3-PT - Filed May 26, 2005

This is a termination of parental rights case.  Father appeals from the order of the Juvenile Court of Benton County terminating his parental rights. Specifically, Appellant asserts that the grounds of failure to substantially comply with the permanency plan and persistence of conditions are not supported by clear and convincing evidence in the record, that the Department of Children's Services failed to exercise reasonable efforts toward reunification and/or relative placement, and that termination of his parental rights is not in the best interest of the child. Because we find clear and convincing evidence in the record to support the trial court's findings, we affirm.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E.HIGHERS, J. and DAVID R. FARMER, J., joined.

Michael U. King of Huntingdon for Appellant, Steven T Kelley

Paul G. Summers, Attorney General and Reporter; William A. Tillner, Assistant Attorney General, for Appellee, State of Tennessee, Department of Children's Services

OPINION

Amanda Hardin ("Hardin") is the mother of T.H. (d.o.b. 5/28/02).  Six days after T.H.'s birth, on June 3, 2002, the Department of Children's Services ("DCS," or "Appellee") filed a "Petition for Temporary Custody" of T.H.  The Petition alleged, in relevant part, that:

> The mother, Amanda Hardin, had no pre-natal care, had two positive
> drug screens during her pregnancy, and did not go to the hospital for
> delivery until several days after her water broke.  Ms. Hardin has
> visible intravenous needle tracks on her arms.  Ms. Hardin is

Hepatitis C Positive. It is unknown if [T.H.] is positive at this time. Ms. Hardin also maintained a monthly prescription for Valium, without informing the prescribing doctor of her pregnancy. Ms. Hardin has pending criminal charges of Felony Evading arrest, Criminal Impersonation, Child Endangerment, and Driving on a Revoked License, regarding an incident involving [T.H.'s] sibling, [D.N.]. This Court found Ms. Hardin guilty of the severe child abuse of [T.H.'s] sibling, [D.N.], for her actions during the incident, which included using the child as a human shield.

The father of T.H. was unknown to DCS at the time of the filing of this Petition. On June 3, 2002, the trial court found probable cause to believe that T.H. was dependent and neglected and entered a "Protective Custody Order." A preliminary hearing on the DCS Petition was held on July 16, 2002. On August 29, 2002, the trial court entered an Order, which indicates that Hardin had named Steven Theodore Kelley ("Kelley," "Father," or "Appellant") as the father of T.H. On the same date, an Order was entered requiring Kelley to submit to a parentage test. Following a hearing on December 3, 2002, the trial court entered an Order on January 2, 2003 declaring Kelley to be the father of T.H. Kelley was ordered to pay $426.00 per month in child support, and was given credit for his two other children by a different mother.

On December 17, 2002, the trial court heard DCS' "Petition for Temporary Custody." Among those present at the hearing were the Guardian ad Litem, Rosella Shackleford, and representatives of DCS. On February 18, 2003, the trial court entered an "Interim Order," which (1) granted temporary custody of T.H. to DCS; (2) approved and incorporated by reference a permanency plan with the sole goal of adoption; and (3) relieved Hardin's attorney and the Guardian ad Litem of their representation pending further hearings.

On December 23, 2002, Kelley filed a "Petition to Establish Custody" seeking to gain custody of T.H. On February 14, 2003, the trial court entered an Order continuing Kelley's "Petition to Establish Custody" pending DCS' completion of a home study of Kelley's home. By this same Order, Kelley was awarded once a week supervised visitation with T.H.

On March 15, 2003, Kelley signed a revised Permanency Plan (the "Plan"). The Plan indicates dual goals of "Return to Parent" and "Adoption." The Plan also identifies five "risks, needs, or problems" involving Kelley, including:

1. Mr. Kelley has not been the primary care giver for this child.
2. Mr. Kelley has a history of domestic violence charges.
3. Mr. Kelley has admittedly [sic] a history of alcohol and drug use.
Mr. Kelley also has a history of DUI.
4. In the beginning of this case[,] Mr. Kelley was aggressive and uncooperative.
5. [T.H.] is Hepatitis C +.

To address these problems, the Plan lists the following goals:

> 1. Mr. Kelley will learn effective parenting skill[s] and nurturance [sic] specific to child appropriate situations and be able to exhibit/use these skills during his visits.
>
> 2. Mr. Kelley will participate with counselor/instructors to assess and/or identify appropriate ways to manage and express his anger.
>
> 3. Mr. Kelley will submit to an Alcohol and Drug Assessment. Mr. Kelley will follow any and all recommendations made by therapists/counselors. Particularly to A/A and/or N/A meetings and drug and alcohol screenings.
>
> 4. Mr. Kelley will cooperate and make sure DCS has access to all documentation by signing agenc[y] appropriate paperwork.
>
> 5. Mr. Kelley and any close care giver, and siblings are at risk of transference of the hepatitis virus
>
>     *                            *                           *
>
> Mr. Kelley, close care givers, and siblings will participate in an educational session(s) to protect themselves and [T.H.] against infection.

The Plan lists "expected achievement dates" for the above referenced goals. In addition to the referencing health professionals, facilities and programs, the Plan names Kelley as the person responsible for achieving each goal.

By Order of June 23, 2003, the trial court found that "the responsibilities set out in the revised permanency plan are reasonably related to the goals; that dual goal of adoption is appropriate due to the ongoing problems of the child's mother and the fact that the child has been in the custody of the State of Tennessee for almost one year; that the Department of Children's Services is exercising reasonable efforts toward the goals, including referral of parents to appropriate services and identifying an adoptive home for the child if reunification is not possible; and that the permanency plan is in the best interest of [T.H.]."

On April 16, 2003, DCS employee Amanda Hendrix submitted her report after conducting a home study of Kelley's home. Among her findings, Ms. Hendrix reported that:

- 
- The home is a three bedroom, two bath older mobile home....
  The home seemed clean and [in] good condition.... Mr.

Kelley has been living at this residence since October 2000.... Mr. Kelley is currently making a mortgage payment of $300 and lacks twelve payments on the mobile home.

- Mr. Kelley reported working for Roll Out Trucking driving a truck for approximately seven or eight months. He reported that he left because he was suffering from back problems and wasn't able to drive on lengthy trips. He is currently working for his father at Kelley Joe Trucking driving a truck locally. His father plans to retire within a few months and Mr. Kelley is going to take over the business. Mr. Kelley reported a weekly income of $200-$250.... He stated the only bills he has is a trailer payment, electric and phone at this time. Mr. Kelley reported being ordered to pay $775 monthly in child support for his two children [from a previous marriage]. He also has been ordered to pay $426 monthly in child support for [T.H.].

- Mr. Kelley reported being diabetic and taking insulin pills to control his diabetes and taking blood pressure medication. He stated he had no other medical problems. He did report being in Aspell Recovery for forty-two days and Pathway for six days in January 2002 for using Oxiconton and Loratabs. He also reported being admitted to Buffalo Valley several years ago for twenty-one days. Mr. Kelley reported that he continues attending AA meeting[s] twice a month.

- Mr. Kelley reported that he was married for nineteen years...[and had] two children [ages 15 and 12].... Mr. Kelley is currently trying to gain custody of his [15 year old] daughter.

- Mr. Kelley has had a total of eight 2-hour supervised visited with [T.H.] since visitation was ordered. Two of those visits, Mr. Kelley had other family members present. According to Mr. Kelley the visits have all gone well. However, the Department has noticed that Mr. Kelley pays better attention to [T.H.] when he visits by himself. On one occasion, Mr. Kelley and his other two children visited with [T.H.] at McDonalds. It was reported that Mr. Kelley changed the baby's diaper on the table where his son was eating and did not wash his hands even though the baby had an oozing diaper rash. Mr. Kelley does not seem to understand the

-4-

> seriousness of taking precautions related to [T.H.'s] Hepatitis
> C.

In her summary, Ms. Hendrix indicates that DCS has some concerns about possible placement with Kelley and that such placement should not take place unless and until recommendations similar to those outline in the Plan, *see supra*, are followed.

On July 15, 2003, Terri Prater, the DCS case manager, submitted a Quarterly Progress Report in which she stated that "[t]his CM has started paperwork to Terminate Parental Rights.... Mr. Kelley has shown no documentation that he has completed any of his responsibilities on the Permanency Plan." On that same day, DCS conducted a periodic review. Present at that review were Ms. Prater, her supervisor Patsy Crockett, and five board members. The "Period Review Summary" indicates that Kelley was notified of the review but was not present. The board found that the need for foster care continued to exist and that the "[f]ather has made little effort other than [to] visit." The "current permanency goal" was listed as adoption in this review summary.

On September 19, 2003, Kelley filed a Petition seeking to have his child support obligation lowered. The Petition also sought an award of custody of T.H. or, in the alternative, that Kelley's visitation be expanded.

On September 30, 2003, DCS filed a "Petition to Terminate Parental Rights" of Kelley, Hardin and Larry Carey, Hardin's husband.[1] As it relates to Kelley's parental rights to T.H., the Petition reads, in pertinent part, as follows:

> The father of the child, Steven T. Kelley, did not attempt to establish paternity of his own accord, even though Ms. Hardin indicated she had told him he was the child's father before the child's birth. Mr. Kelley has been brought before the Court for contempt for failure to pay child support as ordered. Mr. Kelly has not addressed his responsibilities in the permanency plan. Also, on July 29, 2003, Mr. Kelley was convicted of Unlawful Possession of Drug Paraphernalia.
>
> *            *            *
>
> Your Petitioner alleges the following grounds for Termination of Parental Rights, as alternatives to one another:
>
> *            *            *

---

[1] A Default Judgment terminating Mr. Carey's parental rights was entered on March 11, 2004. Carey is not a party to this appeal. See footnote 4 as to termination of Amanda Hardin's parental rights.

2. ...Steven T. Kelley...[has] willfully abandoned this child in that [he has] willfully failed to support or to engage in more than token support for four (4) consecutive months immediately preceding the filing of this petition.

3. The child has been removed by order of this Court for a period of at least six (6) months; the conditions which led to her removal still persist; other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of...Steven T. Kelley...there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to Respondents in the near future; continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

\*                                     \*                                     \*

5. Despite frequent explanations of the statement of responsibilities set out in periodic foster care plans prepared for...Steven T. Kelley, [he has] failed to comply in a substantial manner with those reasonable responsibilities related to remedying the conditions which necessitate foster care placement.

By Order of November 6, 2003, Rosella Shackleford was re-appointed as the Guardian as Litem for T.H.

On November 12, 2003, the Chancery Court of Benton County entered an Order, which, *inter alia*, suspends Kelley's visitation with his two other children "until the Court is of the opinion that [Kelley] is drug free...."

On April 5, 2004, DCS case manager Terri Prater submitted a Quarterly Progress Report in which she noted "No documentation of any tasks identified on the Permanency Plan has been received by DCS/HCCM staff.... FCRB has urged Mr. Kelley to provide copies of paperwork he says he has to DCS staff but he has failed to do so."

On April 20, 2004, Kelley's parents Nancy J. Kelley and Billy J. Kelley (the "Grandparents") filed a "Motion to Intervene & Motion for Custody" seeking to gain custody of T.H. in the event that the trial court denied custody of T.H. to Kelley.[2]   On May 24, 2004, DCS filed a "Motion to Dismiss" the Grandparents' Motion, citing the Grandparents' alleged lack of standing.  By Order of

---

[2] The Grandparents filed an "Amended Motion to Intervene" on May 4, 2004.

May 19, 2004, the Grandparents were allowed to intervene. On May 25, 2004, the Grandparents filed a "Motion for Grandparent Visitation."

On June 8, 2004, the trial court approved a second revised permanency plan (the "Revised Plan") for T.H. with goals for Kelley identical to those of the previous Plan in terms of skills, anger management, drug and alcohol assessment, and cooperation with DCS. The Revised Plan, however, does not require Kelley to participate in any Hepatitis C educational sessions. Although the Revised Plan indicates that Kelley participated in its development, Kelley did not sign the Revised Plan.

On June 29, 2004, a report of the study of the Grandparents' home was filed. The report had been requested by case manager Ms. Prater and was conducted by DCS' employee Glenda Hayes. Ms. Hayes reported that the Grandparents were 63 years old, that Billy Kelley was taking medication for high blood pressure and diabetes, and that Nancy Kelley was taking medication for arthritis. Ms. Hayes expressed "reservations" about recommending the Grandparents' home as an appropriate placement for T.H. Specifically, Ms. Hayes was concerned about the Grandparents' age. Ms. Hayes was also concerned that the Grandparents would have a difficult time denying unsupervised visits to family members who live nearby.[3]

On June 30, 2004, Ms. Prater filed a "Social History for [T.H.]". Ms. Prater reported that "Mr. Kelley has stated that he wants [T.H.] with him. He has tried being affectionate toward [T.H.], however she pushes him away. He has a history of DUI arrest and is currently incarcerated in the Benton County Jail." Ms. Prater noted that Kelley would remain in the Benton County Jail until June 3, 2005, and that Kelley was "not receiving any financial assistance as he is currently incarcerated." Also on June 30, 2004, the trial court entered an Order, which reads, in pertinent part, as follows:

> ...[T]he father has not complied with the permanency plan and has substantial criminal charges; that there is no less drastic alternative to removal [of] the child due to...the father's noncompliance with the permanency plan and criminal charges...that the Department of Children's Services is in compliance with the permanency plan...that the Department of Children's Services has made reasonable efforts to make it possible for the child to return home, which include exploration of relatives, therapeutic visitation and home studies on relatives; and that the responsibilities set out in the permanency plan are reasonably related to the goal and in the child's best interest; and IT IS, THEREFORE, ORDERED:
>
> *                              *                              *

---

[3] As noted in the home study of Kelley's home, the Grandparents live across the road from Kelley's mobile home.

2. That the permanency plan is approved and ratified, and shall be as if set forth herein verbatim with the added goal of relative placement.

On July 15, 2004, the Grandparents filed a "Motion for Permanency Plan and Renewed Motion for Custody," wherein they asked the court for an "Order directing the Department of Children's Services to develop a Permanency Plan for their granddaughter, [T.H.], which contains specific goals pertinent to the [Grandparents'] status as a potential home placement for their granddaughter."

On July 20, 2004, Kelley filed an Answer to DCS' Petition to Terminate his parental rights to T.H. On July 22, 2004, a hearing was held. Following that hearing, on October 12, 2004, the trial court entered its "Order Terminating Parental Rights and Final Decree of Guardianship" (the "Final Order"), which reads, in relevant part, as follows:

...Upon proof introduced at the hearing, statements of counsel, the report of the Guardian Ad Litem...and the entire record, the Court finds upon clear and convincing evidence that the Petition to Terminate Parental Rights...is well taken as to Respondent(s)...Steven T. Kelley, and should be sustained and relief granted thereunder for the causes therein stated:

\*                              \*                              \*

21. That Steven Kelley is currently incarcerated for Violation of Probation.

22. That Steven Kelley admits to a long-term history of abuse of prescription drugs (over 10 (ten) years).

23. That Steven Kelley does have a criminal record.

24. That Steven Kelley entered into a permanency plan with the Department on March 18, 2003, after an assessment by the Department and the plan was approved and ratified by the Court and it was reasonably related to the goal. Mr. Kelley was to participate in parenting classes, an alcohol and drug assessment, a mental health intake for anger management, cooperate with the Department, and learn about Hepatitis C through educational classes.

25. That while Mr. Kelley did participate in the A & D assessment, he has not completed its recommendations.

26. That Mr. Kelley has continued to have legal problems and is currently incarcerated.

27. The child, [T.H.], has been removed by order of this Court for a period of six (6) months; the conditions which led to her removal still persist; other conditions persist which in all probability would cause the child to be subjected to further abuse and neglect and which, therefore, prevent the child's return to the care of the Respondent(s), Steven Kelley...there is little likelihood that these conditions will be remedied at an early date so that this child can be returned to Respondent(s), Steven Kelley...in the near future; and the continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

28. Despite frequent explanations of the Statement of Responsibilities set out in the periodic foster care plans prepared for and signed by Respondent(s), Steven Kelley... [he has] failed to comply in a substantial manner with those reasonable responsibilities related to remedying the conditions that necessitated foster care placement.

29. That the Court does not find abandonment due to willful failure to support as to Mr. Kelley.

30. That Steven Kelley has not been allowed unsupervised visits with the minor child.

31. That the Department of Children's Services did prepare a home study of Mr. Kelley's home which did not approve placement and made recommendations.

32. That Mr. Kelley has incurred criminal charges during the pendency of this matter and is currently incarcerated.

33. That the Department of Children's Services did not approve the home of Billy and Nancy Kelley.

34. That Billy Kelley has visited the child approximately two (2) times.

35. That Nancy Kelley visited the child with the father.

36. That the grandparents have been aware of the child being placed in custody since at least November of 2002.

37. That the child has been in the same foster home and the family intends to adopt the child if free for adoption. The child has a bond with the foster family.

38. That the child has Hepatitis C which requires universal precautions and will more than likely require more care as she ages.

39. That the Court finds no changed circumstances exist to modify custody to the [paternal] grandparents and it is not in the best interest of the child to do so based upon continuity of placement.

40. That the Department has met the statutory obligation to explore relative resources.

41. That the Court finds that the grandparents have no standing to intervene on the Petition to Terminate Parental Rights but has considered all facts presented as to the child's best interest.

42. That the Court finds it is not in the best interest of [T.H.] to grant Grandparent Visitation Rights and therefore, makes no further finding on the Motion.

43. That it is by clear and convincing evidence that it is in the best interest of the child, [T.H.], that the parental rights of Steven Kelley...to the child be forever terminated and that the complete custody, control, and guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place the child for adoption and to consent to such adoption in loco parentis.

44. That the Department of Children's Services has exercised reasonable efforts to prevent removal and reunify the family including encouraging Steven Kelley to cooperate with the permanency plan requirements including counseling and to follow recommendations of the mental health providers, therapeutic visitation, and case management.

\*                    \*                    \*

46. Awarding legal and physical custody to...Steven Kelley would pose a risk of substantial harm to the child.

47. That this shall constitute the findings of fact and conclusions of law.

\*                                    \*                                    \*

IT IS, THEREFORE, ORDERED, ADJUDGED, AND DECREED:

\*                                    \*                                    \*

2. That all parental rights of Steven Kelley...to the child, [T.H.], are hereby forever terminated; that the complete custody, control, and guardianship of said child is hereby awarded to the State of Tennessee, Department of Children's Services, with the right to place the child for adoption and consent to such adoption in <u>loco parentis</u>.[4]

Kelley appeals from the Final Order and raises five (5) issues as stated in his brief:

I. Whether the trial court erred by terminating the parental rights of Steven T. Kelley on the grounds that he failed to substantially comply with the permanency plan entered by the court because the permanency plan was not specific enough to comply with T.C.A. §37-2-403(a)(2)(A) and the due process requirements of the Tennessee and United States Constitutions.

II. Whether the court erred in finding that the Department of Children's Services exercised "reasonable efforts" to reunite Steven T. Kelley with his daughter.

III. Whether the court erred in finding that the Department of Children's Services exercised reasonable efforts when they failed to pursue relative placement as required by T.C.A. §37-2-403(d).

IV. Whether the court erred in finding that clear and convincing evidence exists to terminate Steven T. Kelley's parental rights.

V. Whether the court erred by failing to make sufficient findings of fact as to the best interest of the child and grounds to terminate parental rights as required by T.C.A. §36-1-113(k).

---

[4] This same Order also terminates the parental rights of Hardin. Hardin is not a party to this appeal.

Since this case was tried by a court sitting without a jury, we review the case de novo upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d).

The standard for the termination of parental rights is well settled. The United States Supreme Court has recognized the important nature of cases involving the termination of parental rights, stating that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J*., 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745 (1982) (Rehnquist, J., dissenting)). Accordingly, "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." *Id*. The constitutional protections of the parent-child relationship require certain safeguards before the relationship can be severed. *See O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn.Ct.App.1995) (rev'd on other grounds); *In re: Swanson*, 2 S.W.3d 180 (Tenn.1999)).

As a safeguard, courts are required to apply the heightened "clear and convincing" proof standard. *See Santosky*, 455 U.S. at 769; *O'Daniel*, 905 S.W.2d at 186. To justify the termination of parental rights, the grounds for termination must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1) (Supp.2004); *State Dep't of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App.1996). Although it does not require as much certainty as the "beyond a reasonable doubt" standard, the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard. *O'Daniel*, 905 S.W.2d 182, 188 (Tenn. Ct. App.1995); *Brandon v. Wright*, 838 S.W.2d 532, 536 (Tenn. Ct. App.1992). In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn.1992); *O'Daniel*, 905 S.W.2d at 188. Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W .2d 407, 411 (Tenn. Ct. App.1985). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn.1977); *Goldsmith v. Roberts*, 622 S.W.2d 438, 441 (Tenn. Ct. App.1981); *Brandon v. Wright*, 838 S.W.2d at 536.

T.C.A. § 36-1-113(c)(Supp.2004) governs termination of parental rights and requires that such termination be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination [of] parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interest of the child.

The trial court terminated Kelley's parental rights on the grounds of failure to substantially comply with the permanency plan, and persistence of conditions which are codified at T.C.A. §36-1-113(g)(2) and T.C.A. § 36-1-113(g)(3) (Supp.2004) respectively, to wit:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
>
> *                                   *                                   *
>
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care....
>
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> > (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future;
> > (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

T.C.A. § 36-1-113(c) allows for termination of parental rights if any one of the grounds outlined in T.C.A. § 36-1-113(g) is found by clear and convincing evidence, and termination is in the best interest of the child. We have reviewed the entire record in this case and we find that the record is replete with evidence to support the trial court's finding that termination of Kelley's parental rights is warranted on at least one of the grounds listed in the Final Order. We further find, in accordance with the trial court, that termination of Kelley's parental rights is in the best interest of this child.

**Failure to Substantial Comply with the Permanency Plans**

Sufficiency of the Permanency Plans

-13-

T.C.A. §37-2-403 (Supp. 2004) outlines the requirements of any permanency plan and reads, in pertinent part, as follows:

> (a)(1) Within thirty (30) days of the date of foster care placement, an agency shall prepare a plan for each child in its foster care. Such plan shall include a goal for each child of:
> (A) Return of the child to parent;
> (B) Placement of the child with relatives of the child;
> (C) Adoption, giving appropriate consideration to § 36-1-115(g) when applicable; and/or
> (D) Planned permanent living arrangement.
>
> *                                    *                                    *
>
> Such plans are subject to modification and shall be reevaluated and updated at least annually except when a long-term agreement has been made in accordance with this part.
>
> (2)(A) The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1)...

Kelley first asserts that the permanency plans drafted in this matter do not comply with the requirements set out in this statute. Specifically, Kelley asserts that the permanency plans are not specific in terms of "who will contact the service providers or what services will satisfy the requirements of the plan." We disagree.

As discussed above, in March 2003, after it was determined that Kelley was the father of T.H., Kelley attended a revised permanency plan staffing with DCS case manager Ms. Prater. This Plan listed dual goals of return to parent and adoption. The Plan also identified five "risks, needs or problems" that Kelley would need to remedy in order to gain custody. Those areas of concern included the fact that Kelley had not been the care giver for T.H., that Kelley had a history of domestic violence, a history of drug and alcohol abuse, and had been "aggressive and uncooperative" at the beginning of the case, and that T.H. was Hepatitis C positive. As outlined above, the Plan clearly outlines the actions needed to reduce the risks and resolve the problems raised. Furthermore, for each of these actions, the Plan provides an expected achievement date and clearly indicates that Kelley is to take at least some of the responsibility for completing these goals. From our review of the permanency plans, including revisions thereof throughout the course of these proceedings, we find that the permanency plans comply, in terms of specificity and content, with the requirements of T.C.A. §37-2-403.

-14-

<u>Substantial Noncompliance</u>

As discussed by this Court in ***In re M.J.B.***, 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn.Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn.Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, ***In re Valentine***, 79 S.W.3d at 547; ***In re L.J.C.***, 124 S.W.3d 609, 621 (Tenn.Ct.App.2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. ***In re Valentine***, 79 S.W.3d at 548-49; ***In re Z.J.S.***, 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. ***In re Valentine***, 79 S.W.3d at 548; ***Department of Children's Servs. v. C.L.***, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at (Tenn.Ct.App. Aug.29, 2003) (No Tenn. R.App. P. 11 application filed).

*Id*. at 656-57.

In the instant case, the permanency plans require Kelley to attend parenting class(es), to participate in anger management counseling, to submit to alcohol and drug assessment and follow any recommendations made. In addition, Kelley was required to cooperate with DCS in terms of making sure DCS had access to all relevant documentation, and Kelley was also required to participate in counseling to gain insight and instruction on dealing with T.H.'s Hepatitis C. DCS does not contest the fact that Kelley complied with the requirements concerning counseling for Hepatitis C, nor does DCS contend that Kelley was not cooperative in giving them access to the appropriate paperwork. However, DCS asserts that Kelley has failed to substantially comply with the permanency plans in terms of his attending parenting class(es), participating in anger management, and submitting to alcohol and drug assessment and following the recommendations thereof. Turning to the record, we address each of these three requirements in turn to determine whether Kelley substantially complied with each.

***Parenting Classes***

Concerning the question of exactly what type and what number of parenting classes were required under the permanency plans, Ms. Prater, the DCS case manager, testified, in relevant part, as follows:

> Q. Now, you [DCS] wanted him [Kelley] to go to a parenting class?
>
> A. Uh huh.
>
> Q. And I'm looking at the permanency plan. There's nothing that says that it's supposed to be–you know, what kind of parenting class it was?
>
> A. I can't tell him that. I can't tell him he has to go to a specific place and receive specific training.

Trial Exhibit 17 is a "Certificate of Completion," indicating that Kelley successfully completed "Forever Parents" at the Carl Perkins Center on December 9, 2003. Given the fact that the permanency plan does not specify which parenting class Kelley is required to complete and Ms. Prater's testimony above, it is apparent to this Court that Kelley was in substantial compliance with this requirement of the permanency plans.

*Anger Management*

Trial Exhibit 18 is a "Certificate of Completion," which indicates that Kelley completed the "Basic LOC II Program of Instruction and Counseling [in] Anger Management." However, the date of completion is listed as March 27, 2002, which is before T.H.'s birth. Kelley's testimony indicates that he participated in this anger management class as part of a plea bargain stemming from a domestic assault charge against T.H.'s mother. There is no indication in the record that Kelley has participated in any anger management course(s) since the drafting of the permanency plans.

Concerning the reason why DCS thought it necessary to require Kelley to participate in anger management, Ms. Prater testified that:

> ...At the time that [Kelley] was alleged to be the father, we [DCS] got criminal background information and there was a history of–he had a couple of domestic assault charges, domestics on him. And just in my dealings with him, I mean, he called–one of the first conversations I had with him on the phone he called cussing me, threatening to

come to my home and [DCS] felt that was something that he needed to get under control before he took care of a small child.[5]

If DCS' primary concern in making the anger management recommendation arose from Kelley's domestic assault charges, then Exhibit 18 indicates that Kelley did seek anger management counseling in direct response to those charges. Consequently, from the record before us, we cannot say that there is clear and convincing evidence to support the trial court's finding that Kelley was not in substantial compliance with this requirement of the permanency plans.

### *Alcohol and Drug Counseling*

The record indicates that Kelley has had an ongoing history of prescription drug abuse. The record also indicates that Kelley has periodically sought treatment for his addiction. Trial Exhibit 19 is a "Certificate of Completion" for alcohol and drug treatment through Aspell Recovery Center. The date of this "Certificate of Completion," however, is March 4, 2002, which is before T.H.'s birth. Trial Exhibit 22, however, is a letter from Carey Counseling Center, dated January 14, 2003. The letter indicates that Kelley submitted to an alcohol and drug evaluation. The evaluation indicated that Kelley had a "[h]igh probability of having a substance dependence disorder," and recommended that "Mr. Kelley have outpatient counseling services to address this issue." Mr. Kelley testified that he did schedule an outpatient counseling session for drugs through Carey Counseling and that he did attend at least one session. Although Kelley was arrested for probation violation prior to attending his next scheduled session, the record does indicate that he was at least making some effort toward compliance with this requirement.

From the record before us, we cannot conclude, by clear and convincing evidence, that Kelley was in substantial noncompliance with the permanency plans to such an extent that his parental rights to T.H. should be terminated on that ground; however the trial court also terminated Kelley's parental rights on the ground of persistence of conditions. Since T.C.A. § 36-1-113(c) allows for termination of parental rights if any one of the grounds outlined in T.C.A. § 36-1-113(g) is found by clear and convincing evidence, we will next address whether there is clear and convincing evidence to support termination on the ground of persistence of conditions.

### Persistence of Conditions

Since T.H.'s birth, the record indicates that Kelley has been convicted for possession of drug paraphernalia in May 2003 and for DUI in February 2004. At the time of the hearing in this matter, Kelley was incarcerated for violation of probation. When asked what "violation of probation" meant, Kelley testified as follows:

---

[5] In his testimony, Kelley denies ever having threatened Ms. Prater. The record contains no indication that a complaint or charges were brought stemming from any alleged threat on the part of Kelley toward Ms. Prater by phone or otherwise.

-17-

Q. Is it fair to say that the violation of probation is a failure to report as well as a dirty drug screen?

A. Failure to report.

Q. And a dirty drug screen?

A. Yes.

Q. On the dirty drug screen, is it fair to say that you were using methamphetamine?

A. No.

Q. What were you using?

A. I was going to the doctor getting cough syrup, Lor-tabs and valiums.

Kelley's drug use casts a shadow over the entire history of this case and, from the record before us, it is evident that that problem has not been remedied. Concerning Kelley's drug use, Ms. Prater, testified, in pertinent part, as follows:

Q. Any other information on alcohol and drugs?

      *                    *                    *

A. Yes, he continues to have a history with DUI arrests, possession of marijuana, I think, is specifically one, and paraphernalia, I believe.

Q. So it's continued to be a problem to this date?

A. Yes. Yes.

Furthermore, Kelley's mother, Nancy Kelley, reluctantly admitted that her son still has some level of drug dependancy, to wit:

Q. The testimony has been that when we first started this case it was, we [the Grandparents] want to keep this child until Mr. Kelley, your son, gets himself straight. Does your son have a drug problem?

A. Well, he doesn't have a bad one now. He did before he went to rehab, and he does do some, but he doesn't, I'd say, be a bad drug habit (sic) as you would say.

Q. Do you know what kind of drugs he uses?

A. The doctor gives him some.

Finally, and most telling of all, is Kelley's own testimony concerning his history and present relationship with prescription medications:

Q. [DCS] came out [to perform a home study], I guess it was about March of 2003. Do you remember talking to [the DCS employee] about numerous hospitalizations for the drug issues, put in Buffalo Valley, Aspell Recovery, Pathways? How long has your drug history been going on?

A. Probably 10 years.

Q. And what drugs have you used in the past?

A. Oxi-cotton (sic), Lor-tabs, cough syrup, stuff like that.

Q. That's the same things that you just got prescriptions for again for your back here recently?

A. Yes.

Q. So you've had an ongoing problem with that for 10 years?

A. Yes.

The fact that Kelley had recently gotten a prescription for the same medications that he had abused in the past does not support a finding of recovery. In fact, Kelley admits that he is not fully recovered, that he will need further drug treatment following his release from jail, and that he has not been able to conquer his addiction to date:

Q. So, it's fair to say that while–I don't know if you use drugs in jail or not, but when you get out you're going to need a lot of treatment?

A. Probably.

Q. You haven't kicked it [drug addiction] in 10 years?

-19-

A. No.

\*                                  \*                          \*

A. I'm planning on changing my life when I get out of jail. Changing my ways.

Q. How are you going to do that?

A. Well, I may have to go back to rehab. I don't know.

Q. I would suggest that's probably–

A. Right.

Q. –a probability.

A. Yes.

Although Kelley has made attempts to gain control over his addiction, the record clearly indicates that his battle with drugs is not won. T.H. has been in foster care from the time she was one week old. Kelley's continuing drug abuse, despite several attempts at recovery and even in the face of incarceration, does not support a finding that this condition will be remedied at an early date so as to allow T.H. to safely be in his care. Pursuant to T.C.A. § 36-113(g)(3), and from the record before us, there is clear and convincing evidence to support the trial court's finding that the continuation of the parent and child relationship, in light of Kelley's persistent drug abuse, greatly diminishes T.H.'s chances of early integration into a safe, stable and permanent home.

## Reasonable Efforts

Kelley asserts that DCS did not exercise reasonable efforts to reunite him with T.H. Having reviewed the entire record in this case, we disagree. Unless permitting a child to remain with the biological parent will expose the child to a substantial risk of harm, DCS must make "reasonable efforts" to "[p]revent the need for removal of the child" or, if the child has already been removed, to "[m]ake it possible for the child to return home." T.C.A. § 37-1-166(a); *see also In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 Tenn.App. LEXIS 160, at \*22-23 (Tenn.Ct .App. Mar. 9, 2004). The burden of proving that reasonable efforts have been made in a particular case falls upon DCS. T.C.A. § 37-1-166(b). Whether DCS has used reasonable efforts in a particular case is a fact specific inquiry, and we examine such efforts on a case-by-case basis. The legislature has defined "reasonable efforts" as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." T.C.A. § 37-1-166(g)(1). While DCS bears the burden of proving that reasonable efforts toward reunification are made in a particular case, we are cognizant of the fact that "[r]eunification of a family is a two-way street, and the law

does not require DCS to carry the entire burden of this goal." ***State v. Belder***, No. W2003-02888-COA-R3-PT, 2004 Tenn. App. LEXIS 441, at *24 (Tenn. Ct. App. July 9, 2004); ***State v. Malone***, No. 03A01-9706-JV-00224, 1998 Tenn. App. LEXIS 83, at *5-6 (Tenn. Ct. App. Feb. 5, 1998). The efforts employed by DCS in a particular case do not have to be "Herculean," ***In re C.M.M.***, 2004 Tenn.App. LEXIS 160, at * 25, but they must be "reasonable efforts." T.C.A. § 37-1-166(a)(1); ***Malone***, 1998 Tenn.App. LEXIS 441, at *6.

In its Final Order, the trial court found that DCS "has exercised reasonable efforts to prevent removal and reunify the family including encouraging Steven Kelley to cooperate with the permanency plan requirements including counseling and to follow recommendations of the mental health providers, therapeutic visitation, and case management." Ms. Prater testified that she met with Kelley on several occasions to explain the requirements of the permanency plans. Ms. Prater also sent a letter to Kelley and his attorney suggesting an anger management program, and informed Kelley that he could attend any of the programs offered by Carey Counseling. Ms. Prater testified that she went over quarterly reports with Kelley, that she made arrangements for him to receive instruction on T.H.'s Hepatitis C with the education specialist at the health department in Paris, Tennessee, and that she urged Kelley to seek drug and alcohol counseling. In addition, DCS facilitated therapeutic visitations between Kelley and T.H. From the record before us, and in light of the resources available to DCS, we cannot conclude that the trial court erred in finding that DCS satisfied the reasonable efforts requirement in this case.

**Relative Placement**

Kelley next contends that DCS failed to make reasonable efforts to place T.H. with relatives as required by T.C.A. 37-2-403(d). T.C.A. §37-2-403(d) (Supp. 2004) reads, in relevant part, as follows:

> Whenever a child is removed from such child's home and placed in the department's custody, the department shall seek to place the child with a fit and willing relative if such placement provides for the safety and is in the best interest of the child....

As discussed above, Kelley was declared to be the father of T.H. on December 3, 2002. On December 23, 2002, Kelley filed a Petition to Establish Custody. On September 30, 2003, DCS filed its petition to terminate Kelley's parental rights. Then, on April 20, 2004, the Grandparents filed their Motion to Intervene and Motion for Custody. Following that filing, Glenda Hayes conducted a home study of the Grandparents' home as requested by DCS. Ms. Hayes reported two concerns about recommending the Grandparents' home as a placement for T.H. The first was the age of the Grandparents in light of "caring for a small child with major health issues until the child reaches an age [where] she can care for herself." Ms. Hayes' second reservation was the fact that she thought the Grandparents "would have a hard time denying unsupervised visits of [T.H.] to family members who lived near by [i.e. Kelley, who lived directly across the street]." In addition to these concerns, the record indicates that the Grandparents were more interested in a short-term placement than in a long-term arrangement. Ms. Hayes testified, in relevant part, as follows:

Q. Did you ask questions of both Mr. and Ms. Kelley about their long-term commitment to the child, what indications did they give?

A. They indicated that they did not want this to be a long-term placement. They would prefer it not be a long-term placement.

Q. And what did they expect of this, your understanding?

A. They expected this to just be a placement until their son could get his problems solved and hopefully become the parent that he should be to his child.

Concerning the steps that DCS took to find relative placement for T.H., Ms. Prater testified, in pertinent part, as follows:

Q. It's been brought up today that the department didn't look at relative placements until June 4, 2004. Tell me about the relative situation. In fact, when the child first came into custody, have relatives been a support?

A. When we get–when children come into custody, we consider all options; relatives. We may not go to their home and say, I'm here for an inspection to see if your home and your people who live in your home is (sic) appropriate for placement. But I had occasion to speak with Ms. Kelley. Teddy [Kelley] had given me her–their phone number for contact. He was still driving a truck when [T.H.] first came into custody, and, you know, getting some contact established and stuff. When I was looking for Teddy [Kelley], he was–she [Ms. Kelley] took the information; she didn't ask any questions; she never offered any other information. She never said, Can I come visit, Teddy's not going to get to come today, is it okay if I come visit? Can my husband come visit.

Further testimony suggests that the Grandparents had no real interest in taking custody of T.H. until just before the hearing on DCS' petition to terminate Kelley's parental rights, to wit:

Q [to Ms. Prater]. Was Ms. Kelley ever–Did she ever say, I want to be a placement option?

A. No. When I went–When we discussed permanency planning, we also talk about what's your plan, who's going to help, is there anybody else. And Teddy always reassured me that his mother would

-22-

be there to help take care of [T.H.] and that he had a sister to help take care of [T.H.].

Q. But it was never that they were willing to take [T.H.]?

A. No.

Q. In fact this petition [i.e. the Motion to Intervene and Motion for Custody filed by the Grandparents] was filed, I think, in April of 2004. Were you a little shocked by the filing of the petition?

A. Was I shocked by the filing of the petition of custody on behalf of the [Grandparents]? Yes.

Q. Why is that?

A. This is two years down the road. You know, it's–to me it's–you know, Teddy's in jail and it's like a last-ditch effort to keep [T.H.] in the family.

Q. ...Is that one of your concerns, that the Kelleys are here to just basically, Don't terminate my son so we can have a chance here, but we want to give this child to its Dad? Is that kind of what–

A. Yeah. I mean–Yeah. You know, they only want custody; they're not filing for adoption....

Despite the late filing of their Motion to Intervene and Motion for Custody and DCS' concerns about the seriousness of the Grandparents' interest in the welfare of T.H., DCS did conduct a home study of the Grandparents' home and did allow Mrs. Kelley to attend visitation sessions with T.H. Ms. Prater also testified that T.H.'s maternal grandmother was also considered as a possible placement for T.H. but that her home was found to be inappropriate due, in part, to the fact that "[s]he had the same history basically as the mother did."

T.C.A. §37-2-403(d) does not mandate relative placement. Rather, the statute requires DCS to consider such placement in light of the safety and best interest of the child. Here, the record indicates that DCS did exercise reasonable efforts in seeking to place T.H. within the family; however, due to those legitimate concerns discussed above, such placement was not found to be in the best interest of T.H.

**Best Interest**

Before a court in this state can terminate a biological parent's parental rights, it must find that doing so is in the best interest of the child. ***See*** T.C.A. § 36-1-113(c)(2) (Supp. 2004). In determining whether termination of parental rights is in a child's best interest, the lower court must consider the following factors:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i) (Supp. 2004).

This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. ***State v. T.S.W.***, No. M2001-01735-COA-R3-JV, 2002 Tenn.App. LEXIS 340, at *9 (Tenn. Ct. App. May 10, 2002).

As discussed above, Kelley continues to struggle with his drug addiction. Despite the reasonable efforts made by DCS, Kelley has failed to make such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in his home. In fact, Kelley's situation has deteriorated during the pendency of this matter resulting in his incarceration at the time of the hearing.

Despite the fact that Kelley has attended visitations with T.H., the record indicates that there is no bond between Kelley and T.H. Ms. Hauser, T.H.'s foster parent, testified, in relevant part, as following concerning T.H.'s behavior surrounding visitation:

> Q. How has the child acted after the visits or has there been any significance in how the child acts after the visits?
>
> A. Not until fairly recently, before, I guess–I assume she was just too young, but here probably in the last–within the last six months or so, there has been obvious–she's become more vocal of saying no visit, no visit. We had just recently started the potty training thing and she did really good to have no–any accidents until the day of the visit and then she would pee herself both days; she would wet herself those days. But other than that, we didn't have any accidents or she would have accidents on the way making the effort to get tot he restroom. She never just stood still and wet herself. But the day of the visits she did. When she came back she was–she was a little more physical to handle, throwing things, throwing her food which is not normal behavior for her. To yell. She seemed more frustrated with things. That's my opinion. She–She wouldn't want to eat. I'd have to be a little more insistent on her eating....
>
> Q. Was this consistent with every single visit?
>
> A. Yes, ma'am.

In addition, Patty Roberson, who supervised the therapeutic visitation sessions, testified, in relevant part, as follows:

> Q. Have the visits gotten better over time or how were the visits going the past 11 months?
>
> A. They started out a little rocky; they got a little better and then they've kind of–just kind of stagnant.
>
> Q. In what way?

A. The–I mean, Mr. Kelley shows affection, you know, and he will try to initiate contact and have contact with [T.H.]. But she'll push him away. And the more he shows the affection, the more she pushes away. As–And that kind of–that–it started and then it would get a little bit better where she would interact more and be more comfortable. But then it's more of that pushing away towards the end here.

      *                                *                    *

Q. I believe you testified...that it was your opinion that the visits between [T.H.] and her dad and her grandmother–I believe you used the phrase stagnant and no progress?

A. Yes, ma'am.

Q. Could you elaborate a little bit on what you mean by that?

A. I mean, they show–As I've stated, obviously they show affection, but if–there's not a bond there. It's like everybody–It's kind of like they come together and we're here for two hours and then everybody goes home. And then we meet back again next week, we're here for two hours, everybody goes home. There's no–There's no connection. Towards the end of the visits, you know, when I–when I would observe–and I can only testify on what I see here–I would not observe them hugging, kissing, I love you, you know. I did notice at times that Mr. Kelley would try to hug [T.H.] and kiss her and he did tell her goodbye and I love you. But as the visits progressed, that got less and less.

The visitation summaries kept by Ms. Roberson and introduced at the hearing do indicate that there have been some positive visits between T.H. and Kelly; however, the record does not support a finding that a meaningful relationship has otherwise been established between the parent and child.

Finally, T.H.'s Hepatitis C makes her a special needs child. T.H.'s pediatrician, Dr. Paul Evans testified that "left untreated, [Hepatitis C] has a very significant impact on a person's health..." in the long-term. Dr. Evans indicated that new and better treatments for Hepatitis C are presently being researched and that it is imperative that T.H.'s guardian keep in contact with health-care professionals in order to make sure that T.H. receives such treatments as they become available, to wit:

Q[to Dr. Evans]. So I guess the bottom line is that somebody's going to have to be very focused on treating this child and working with medical professionals, whoever takes care of this child?

A. That-That's–Yes, that is the bottom line.

The record indicates that T.H.'s foster parents, who have expressed a desire to adopt her, have maintained good contact with T.H.'s doctors and that all of T.H.'s medical needs have been met under the supervision of her foster parents. In addition, the testimony of the foster mother indicates that she has a good knowledge and respect for the universal precautions necessary when living with a person, especially a child, infected with Hepatitis C. On the other hand, the record indicates that Kelley has shown little concern for these precautions as evidenced by his changing T.H.'s diaper on a table at a McDonald's Restaurant, while his son was eating at the same table, and not washing his hands after changing the diaper. In addition, at visitations, supervisors noted that neither Kelley nor his mother took precautions to wipe toys and/or furniture after T.H. was observed putting her mouth on these items. From the evidence before us, we cannot say that the trial court erred in finding that there is clear and convincing evidence that termination of Kelley's parental rights is in the best interest of this child.

For the foregoing reasons, we affirm the Final Order of the trial court terminating Kelley's parental rights to T.H. Costs of this appeal are assessed against the Appellant, Steven T. Kelley, and his surety.

_____

W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.